# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiffs,<br><br>vs.<br><br>SANDRA K. HANSON,<br><br>Defendant. | No. CR09-4057-MWB<br><br>**REPORT AND RECOMMENDATION ON MOTION TO SUPPRESS** |

On November 19, 2009, the grand jury returned an Indictment against the defendant Sandra K. Hanson, and codefendants Peter and Charles Hanson, charging them with conspiracy to possess with intent to distribute and distribution of 1000 kilograms or more of marijuana, in violation of 21 U.S.C. §§ 841(a)(1), 841(b((1)(A), and 846. Doc. No. 4. On January 4, 2010, Sandra Hanson ("Sandra") filed a motion to suppress all evidence resulting from a search of her vehicle on October 28, 2009. Doc. No. 25.

The Trial Management Order assigned motions to suppress to the undersigned for appropriate disposition. Doc. No. 17, § IV.A. The court held a hearing on the motion on January 29, 2010, at which Assistant United States Attorney Robert Knief appeared on behalf of the plaintiff (the "Government"), and Sandra appeared with her attorney Jay Denne. Tri-State Drug Task Force Officer Darin John Heideman, and Monona County Sheriff's Deputy Troy Jeffrey Tadlock testified on behalf of the Government. One exhibit was admitted into evidence, to-wit: **Gov't Ex. 1**, a DVD containing a video recording of the traffic stop in question.

## *BACKGROUND FACTS*

The evidence indicates that in May 2009, a confidential source ("CS") provided information to officers of the Sioux City Police Department regarding a marijuana

operation. The CS described in some detail his dealings with Sandra and other individuals in the distribution of marijuana. The information the CS provided included a description of two trucks Sandra and the others were using: a white Dodge pickup truck and a blue Chevrolet 2500 pickup truck. The CS stated the Hansons would drive one of the trucks to the Houston, Texas, area about once a month to pick up marijuana and bring it back to the Sioux City, Iowa, area. He described where the Hansons kept the marijuana at their residence, and how much marijuana he was purchasing from them.

The officers contacted members of the DEA's Tri-State Drug Task Force, and the information supplied by the CS was passed on to TFO Heideman. He and other officers verified that Sandra owned or had access to two trucks matching those described by the CS. The officers set up electronic surveillance on both of the trucks, and also visual surveillance of the Chevrolet pickup. In September 2009, officers monitored the Chevrolet pickup, carrying unknown occupants, as it traveled to the area of Crosby, Texas. In late October 2009, they again detected the Chevrolet pickup traveling to Texas. Visual surveillance of the truck was picked up by DEA officers in the Houston area, who confirmed via photographs Heideman had sent them that Charles Hanson and his mother, Sandra Hanson, were the occupants of the truck. The Houston-based officers maintained surveillance of the truck, following it to the area of Crosby, Texas, the same location where the September trip had concluded.

When the Hansons began their return trip, Heideman and other Task Force officers sought the assistance of Monona County, Iowa, officers in conducting a traffic stop of the Chevrolet. They contacted the Monona County Sheriff, who alerted Deputy Tadlock to expect a call from Task Force officers when the truck neared the Monona County area. Tadlock works with a K-9 unit that is a certified drug detection dog.

Officers kept Tadlock up to date on the truck's progress northward. They contacted him when the truck was near Nebraska City, Nebraska. Tadlock told the officers to alert

him when the truck passed the Missouri Valley exit on I-29 northbound. They did, and Tadlock went out to I-29 to wait for the truck to pass him, which it did near the Blencoe exit on I-29. Tadlock began following the truck. He clocked the truck's speed at slightly over the speed limit, and he observed the vehicle's passenger-side tires cross onto the fog line briefly at one point. He initiated a traffic stop of the vehicle for these violations.

Tadlock parked his patrol car behind the Chevrolet pickup truck. He approached the passenger's side of the truck, and initiated contact with the vehicle's occupants. Sandra was sitting in the passenger's seat and Charles Hanson was driving. Tadlock told Charles he had been stopped for speeding and crossing the fog line, and Charles retrieved his driver's license, registration, and insurance verification. Charles then accompanied Tadlock back to his patrol car, where they sat in the front seat.

Tadlock asked Charles several questions abut where the Hansons had been on their trip, and some of the details about the trip. At one point, Tadlock went back up to the truck where Sandra was sitting so he could verify the truck's VIN. While there, he asked Sandra some of the same questions he had asked Charles. The two gave different responses to some of the questions. Charles indicated they had been to visit his Uncle John, who was Sandra's brother. Sandra stated Uncle John was her mother's brother; in other words, Charles's great-uncle. Charles stated Uncle John's house was white, while Sandra stated the house was blue. Neither Charles nor Sandra could provide the address for Uncle John's house. Tadlock also found it suspicious that they had stayed in a motel rather than staying with "Uncle John." These discrepancies, although minor, raised Tadlock's suspicions, particularly when coupled with the information he had received previously and Charles's visible nervousness during the traffic stop.

Tadlock issued a warning citation to Charles for speeding, and he returned Charles's identification and paperwork to him. Charles had decided he wanted his mother to drive, so when he returned to the truck, he went to the passenger's side and Sandra got out. As

3

Sandra was walking around the back of the truck, Tadlock yelled, "Hey, Sandra." She came to where he was standing, and he asked, "While I've got you here, do you mind if I ask you a few questions?" Sandra agreed, and Tadlock asked if she had any illegal weapons, drugs, or stolen property in the truck. She said she did not, and he asked if he could search the truck. Sandra said, "Yep." Tadlock and Sandra then got into the front seat of the patrol car so Tadlock could complete a written consent-to-search form for Sandra's signature.[1] While Tadlock was completing the form and before Sandra signed it, Sandra stated she had changed her mind. She then asked why he needed to search her vehicle, and Tadlock responded that he believed she had illegal drugs in the vehicle and she was not being completely honest with him. He asked, "How much marijuana do you have in your car?" and Sandra responded, "I have no marijuana. Why do you think I do?" Tadlock also asked Sandra if she was responsible for everything in her vehicle, and Sandra answered, "Absolutely."

Tadlock advised Sandra that he was going to take his drug dog around the truck. Tadlock testified there are different ways his dog will respond to the presence of suspected controlled substances. The dog will "alert" by changing its behavior. It will "indicate" by scratching at a place or item. Tadlock took his K-9 around the truck several times. He testified the dog alerted by showing "a lot of interest but no indication." Tadlock put his dog back into the patrol car and called another officer with a K-9 unit to come to the scene. He also had another conversation with Task Force officers and learned they had additional information indicating there were drugs in the truck, and other officers were on their way to the scene to search the vehicle.

---

[1] Sandra initially started to get into the back seat of the patrol car. On the tape, Tadlock can be heard yelling, "No, no, no, no, no!" He did not want her to open the back door because his K-9 unit could exit the patrol car and possibly be injured on the highway. Sandra then got into the passenger's side of the patrol car's front seat.

Tadlock told Sandra that his dog had shown interest in the back of the truck, and another drug dog was coming to the scene. He asked Sandra if he could look in the back of the truck, which was covered by a topper. According to Tadlock, Sandra consented without hesitation. The video shows that before Tadlock approached the back of the truck, Sandra stated, "Do you want him to go in [referring to the dog]? You can have him go in there. I don't want you to tear my car up." She stated she would rather have the dog go into the truck and tell Tadlock there were no drugs inside than to have Tadlock pull all of her stuff out. Tadlock and Sandra approached the truck and Sandra opened the back of the truck. Tadlock observed several items in the back of the truck. After some brief conversation about furniture and other items in the back of the truck, Tadlock got his dog from the patrol car, put it in the back of the pickup, and the dog indicated on something at the front of the truck bed, near the cab of the truck. Tadlock told Sandra and Charles that the dog's indication provided him with probable cause to search the truck. He pulled out a few items until he could reach the area where the dog had indicated, where he found marijuana inside a plastic bin. Tadlock placed Sandra and Charles under arrest.

From the time Tadlock stopped the truck to the time he issued the warning ticket and gave Charles back his license and documents, about thirteen minutes had elapsed. From that time until the drugs were found, another twenty-four minutes had elapsed.

## *DISCUSSION*

Hanson argues that because the search and seizure occurred after the warning citation had been issued to Charles Hanson and he had left Tadlock's patrol car, the search and seizure violated Hanson's Fourth Amendment rights. *See* Doc. No. 25-1. Hanson argues the traffic stop was over when the warning citation was issued, and any further detention of her after that point required Tadlock to have a reasonable suspicion of criminal activity based on something that occurred during the traffic stop. *Id.* Hanson

5

relies on *United States v. Page*, 154 F. Supp. 2d 1320 (M.D. Tenn. 2001); and two cases from the State of South Dakota, *State v. Almond*, 511 N.W.2d 572, 573 (S.D. 1994), and *State v. Ballard*, 617 N.W.2d 837 (S.D. 2000), all of which held searches to be unconstitutional under similar circumstances.

Hanson ignores Eighth Circuit authority that directly contradicts her argument. In *United States v. Yang*, 345 F.3d 650 (8th Cir. 2003), the court considered circumstances similar to those in the present case. Yang was stopped on the highway for having windows that were tinted darker than allowed by Iowa law. While the officer was writing a warning citation to Yang, he asked Yang several questions about his trip. The officer also observed fast food wrappers, toilet paper, and an atlas in the car, and he noticed there was only one key on Yang's key ring. After the officer issued the warning citation, but before Yang left the patrol car, the officer asked Yang if he had any illegal drugs or other contraband in his car. Yang answered in the negative, and then got out and started to walk toward his car. The officer got out of his patrol car and yelled out to Yang, "Sir! You're free to go and all but I, would it be alright [sic] if I searched your car?" Yang initially said, "Yea," but then he asked if he could just leave. The officer responded that he could, and Yang stated, "Oh, then I'm just going to go." The officer continued talking to Yang about his trip, a tattoo Yang had gotten recently, and the weather. Although Yang declined to sign a consent-to-search form, he eventually consented to open the trunk and let the officer search it, and then he consented to allowing another officer who had arrived at the scene search the vehicle's interior.

The search of Yang's vehicle yielded nothing illegal. The officers then decided to call a K-9 unit to the scene. Yang told the officers they had detained him long enough and he wanted to leave. The officers stated they thought Yang was transporting drugs because of inconsistencies in his statements. They stated Yang could leave, but they were going to detain the vehicle until the drug dog arrived at the scene. Yang elected to remain at the

6

scene. The K-9 unit arrived, and alerted on Yang's vehicle. The officers then took the vehicle to a nearby truck stop for a further search. Again, the officers found nothing incriminating. Yang left the truck stop before the search was completed. The officers informed the truck stop owner that Yang could retrieve the vehicle if he returned. The officers obtained a warrant the next day to search the vehicle, and ultimately found drugs in the car.

The undersigned recommended Yang's motion to suppress be granted for reasons similar to the arguments Hanson is raising here. Judge Mark W. Bennett agreed with the undersigned, and granted Yang's motion to suppress. The Eighth Circuit Court of Appeals reversed. The court held the officers did not violate Yang's rights by asking him for consent to search his vehicle even after the traffic stop had concluded. The court held, "Law enforcement officers do not violate the Fourth Amendment by asking a person for consent to search or other types of cooperation, even when they have no reason to suspect that person, 'provided they do not induce cooperation by coercive means.'" *Yang*, 345 F.3d at 645 (quoting *United States v. Drayton*, 536 U.S. 194, 201, 122 S. Ct. 2105, 153 L. Ed. 2d 242 (2002); and citing *United States v. Jones*, 269 F.3d 919, 925 (8th Cir. 2001)). The court further held that "the time it takes for an officer to find out if consent will be given cannot be an unlawful detention in the absence of coercive or otherwise unusual circumstances." *Id*.

The *Yang* court observed that even if the officer's request for consent to search amounted to illegal detention, "the illegality was purged by Yang's voluntary consent to the search." *Id*. (citing *United States v. Kreisel*, 210 F.3d 868, 869 (89th Cir. 2000) ("consent purges illegal taint")). The court noted that even if an officer uses "a bit of deception in trying to persuade [an individual] to sign a consent-to-search form," that tactic, although distasteful, is not constitutionally coercive. *Id*.

7

The *Yang* court agreed that Yang effectively revoked his consent to search when he told the officers they had searched long enough and he wanted to leave. However, the court found the officers had reasonable suspicion to justify their further detention of the vehicle until the drug dog arrived. The court held:

> The Supreme Court has said repeatedly that courts must look at the totality of the circumstances when deciding whether there was reasonable suspicion supporting an investigatory detention. *United States v. Arvizu*, 534 U.S. 266, 273, 122 S. Ct. 744, 151 L. Ed. 2d 740 (2002). Thus, even if Yang's individual actions might be innocently explained, his behavior "must be considered as a whole and in the light of the officers' 'experience and specialized training.'" *United States v. Ameling*, 328 F.3d 443, 448 (8th Cir. 2003) (quoting *Arvizu*, 534 U.S. at 273, 122 S. Ct. 744). . . .
>
> An officer making a traffic stop may ask the driver his destination and the purpose for his trip. *United States v. Linkous*, 285 F.3d 716, 719 (8th Cir. 2002). . . . The answers to these routine questions may arouse suspicion that other criminal activity is afoot, in which case the officer may ask additional questions to verify or dispel his suspicion. . . . "An officer's suspicion of criminal activity may reasonably grow over the course of a traffic stop as the circumstances unfold and more suspicious facts are uncovered." *Linkous*, 285 F.3d at 720.

*Yang*, 345 F.3d at 655-56.

The court held that given Yang's inconsistent answers to questions, his nervousness, and the officers' observations, "the troopers had reasonable suspicion that the car might be transporting illegal drugs, which warranted a brief detention until the drug dog arrived and sniffed the vehicle." *Yang*, 345 F.3d at 656 (citing *United States v. Bloomfield*, 40 F.3d 910, 917 (8th Cir. 1994) (en banc) "(one-hour detention was lawful)"; *United States v. White*, 42 F.3d 457, 460 (8th Cir. 1994) "(eighty-minute wait for a drug dog was reasonable)").

Notably, the dissent in *Yang* focused on factors analogous to those in the present case. The dissent noted that some of what was deemed the officer's "reasonable suspicion" was based not on his professional training and experience, but on his own personal hunch or personal opinion. *See Yang*, 345 F.3d at 659-60. In the present case, some of the factors Tadlock listed as raising his suspicion were based on his personal opinion or experience. For example, he testified he thought it was unusual that the Hansons had stayed in a motel when visiting "Uncle John," rather that staying at their relative's home. He also found it suspicious that neither Sandra nor Charles could recall the uncle's address. The undersigned noted during the hearing that both of these facts are commonplace, even relating to the undersigned's visits to the homes of his own children.

Nevertheless, Tadlock's reasonable suspicion arose not only from the Hansons' inconsistent answers to questions about their trip, but also from the information he had obtained from Task Force officers about the suspected drugs in the Hansons' vehicle. Tadlock's continued detention of the Hansons for the drug dog sniff, and even to await the arrival of another drug dog after his own K-9 unit showed interest in the truck, was justified by Tadlock's reasonable suspicion that criminal activity unrelated to the stop was afoot. *See United States v. Chavez Loya*, 528 F.3d 546, 553 (8th Cir. 2008), and cases cited therein. In making this determination, the court considers the collective knowledge of all of the officers involved in the investigation, not merely "'the information within the knowledge of the officer on the scene if there is some degree of communication.'" *United States v. Morales*, 238 F.3d 952, 954 (8th Cir. 2001) (quoting *United States v. Horne*, 4 F.3d 579, 585 (8th Cir. 1993)); *see United States v. Thompson*, 533 F.3d 964, 969 (8th Cir. 2008) (collective knowledge of all officers involved in investigation can be imputed to the officer who initiates the traffic stop if there is communication between the officers).

Tadlock never drew his weapon, intimidated the Hansons, or made coercive statements to them. He did not raise his voice, and was respectful throughout the

encounter. Neither of the Hansons ever stated they wanted to leave. Sandra consented to have the K-9 unit enter the back of her truck, which resulted in discovery of the marijuana. Applying Eighth Circuit precedents, Hanson's motion to suppress should be denied. *See Yang, supra; United States v. Rivera*, 570 F.3d 1009 (8th Cir. 2009); *see also United States v. Long*, 532 F.3d 791 (8th Cir. 2008).

Accordingly, for the reasons discussed above, IT IS RESPECTFULLY RECOMMENDED that Hanson's motion to suppress be **denied**. Objections to this Report and Recommendation must be filed by **February 8, 2010**. Responses to objections must be filed by **February 11, 2010**.

**IMPORTANT NOTE:** Any party planning to lodge any objection to this Report and Recommendation must order a transcript of the hearing promptly, but no later than **February 4, 2010**, <u>regardless of whether the party believes a transcript is necessary to argue the objection</u>. If an attorney files an objection without having ordered the transcript as required by this order, the court may impose sanctions on the attorney.

**IT IS SO ORDERED.**

**DATED** this 1st day of February, 2010.

_____
PAUL A. ZOSS
CHIEF MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT