**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION**

UNITED STATES OF AMERICA,

        Plaintiff,

vs.

SANDRA HANSON,

        Defendant.

No. CR09-4057-MWB

**ORDER CONCERNING
MAGISTRATE'S REPORT AND
RECOMMENDATION REGARDING
DEFENDANT'S MOTION TO
SUPPRESS**

————————————

**TABLE OF CONTENTS**

*I.* **INTRODUCTION AND BACKGROUND** . . . . . . . . . . . . . . . . . . . . . . . . . . 2
   *A. Procedural Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
   *B. Factual Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*II.* **LEGAL ANALYSIS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
   *A. Standard Of Review* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
   *B. Objections to Report and Recommendation* . . . . . . . . . . . . . . . . . . 12
      *1. Staleness of information* . . . . . . . . . . . . . . . . . . . . . 12
      *2. Lack of veracity of the confidential informant* . . . . . . . . 17
      *3. Lack of drug dog's initial indication* . . . . . . . . . . . . . . 19
      *4. Voluntariness of consent to search* . . . . . . . . . . . . . . . 20

*III.* **CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

# I. INTRODUCTION AND BACKGROUND

## A. Procedural Background

On November 19, 2009, an indictment was returned against defendant Sandra K. Hanson, charging her with conspiracy to distribute and possess with intent to distribute 1000 kilograms or more of marijuana, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846. On January 4, 2010, defendant Hanson filed a Motion to Suppress. In her motion, defendant Hanson seeks to suppress evidence obtained from her pickup truck, following a traffic stop, which was obtained without a search warrant. Defendant Hanson further seeks to suppress all evidence obtained as a result of a search of her residence on the ground that this evidence is the fruits of an illegal search.

Defendant Hanson's motion to suppress was referred to Chief United States Magistrate Judge Paul A. Zoss, pursuant to 28 U.S.C. § 636(b). After conducting an evidentiary hearing, on January 29, 2010, Judge Zoss filed a Report and Recommendation in which he recommends that defendant Hanson's Motion to Suppress be denied. Judge Zoss concluded that while the search and seizure occurred after a warning citation had been issued, the law enforcement officer's continued detention of defendant Hanson in order to permit a drug dog sniff was justified by that officer's reasonable suspicion that criminal activity unrelated to the stop was afoot. Judge Zoss further found that defendant Hanson consented to having a drug sniffing dog enter the back of her truck, which resulted in the discovery of marijuana in the vehicle. Accordingly, Judge Zoss recommended that defendant Hanson's Motion to Suppress be denied. Defendant Hanson has filed objections to Judge Zoss's Report and Recommendation. The prosecution, in turn, has filed a timely response to defendant Hanson's objections. The court, therefore, undertakes the necessary review of Judge Zoss's recommended disposition of defendant Hanson's Motion to Suppress.

## B. *Factual Background*

In his Report and Recommendation, Judge Zoss made the following findings of fact:

> [I]n May 2009, a confidential source ("CS") provided
> information to officers of the Sioux City Police Department
> regarding a marijuana operation. The CS described in some
> detail his dealings with Sandra and other individuals in the
> distribution of marijuana. The information the CS provided
> included a description of two trucks Sandra and the others
> were using: a white Dodge pickup truck and a blue Chevrolet
> 2500 pickup truck. The CS stated the Hansons would drive
> one of the trucks to the Houston, Texas, area about once a
> month to pick up marijuana and bring it back to the Sioux
> City, Iowa, area. He described where the Hansons kept the
> marijuana at their residence, and how much marijuana he was
> purchasing from them.
>
> The officers contacted members of the DEA's Tri-State
> Drug Task Force, and the information supplied by the CS was
> passed on to TFO Heideman. He and other officers verified
> that Sandra owned or had access to two trucks matching those
> described by the CS. The officers set up electronic
> surveillance on both of the trucks, and also visual surveillance
> of the Chevrolet pickup. In September 2009, officers
> monitored the Chevrolet pickup, carrying unknown occupants,
> as it traveled to the area of Crosby, Texas. In late October
> 2009, they again detected the Chevrolet pickup traveling to
> Texas. Visual surveillance of the truck was picked up by DEA
> officers in the Houston area, who confirmed via photographs
> Heideman had sent them that Charles Hanson and his mother,
> Sandra Hanson, were the occupants of the truck. The
> Houston-based officers maintained surveillance of the truck,
> following it to the area of Crosby, Texas, the same location
> where the September trip had concluded.

When the Hansons began their return trip, Heideman and other Task Force officers sought the assistance of Monona County, Iowa, officers in conducting a traffic stop of the Chevrolet. They contacted the Monona County Sheriff, who alerted Deputy Tadlock to expect a call from Task Force officers when the truck neared the Monona County area. Tadlock works with a K-9 unit that is a certified drug detection dog.

Officers kept Tadlock up to date on the truck's progress northward. They contacted him when the truck was near Nebraska City, Nebraska. Tadlock told the officers to alert him when the truck passed the Missouri Valley exit on I-29 northbound. They did, and Tadlock went out to I-29 to wait for the truck to pass him, which it did near the Blencoe exit on I-29. Tadlock began following the truck. He clocked the truck's speed at slightly over the speed limit, and he observed the vehicle's passenger-side tires cross onto the fog line briefly at one point. He initiated a traffic stop of the vehicle for these violations.

Tadlock parked his patrol car behind the Chevrolet pickup truck. He approached the passenger's side of the truck, and initiated contact with the vehicle's occupants. Sandra was sitting in the passenger's seat and Charles Hanson was driving. Tadlock told Charles he had been stopped for speeding and crossing the fog line, and Charles retrieved his driver's license, registration, and insurance verification. Charles then accompanied Tadlock back to his patrol car, where they sat in the front seat.

Tadlock asked Charles several questions about where the Hansons had been on their trip, and some of the details about the trip. At one point, Tadlock went back up to the truck where Sandra was sitting so he could verify the truck's VIN. While there, he asked Sandra some of the same questions he had asked Charles. The two gave different

responses to some of the questions. Charles indicated they had been to visit his Uncle John, who was Sandra's brother. Sandra stated Uncle John was her mother's brother; in other words, Charles's great-uncle. Charles stated Uncle John's house was white, while Sandra stated the house was blue. Neither Charles nor Sandra could provide the address for Uncle John's house. Tadlock also found it suspicious that they had stayed in a motel rather than staying with "Uncle John." These discrepancies, although minor, raised Tadlock's suspicions, particularly when coupled with the information he had received previously and Charles's visible nervousness during the traffic stop.

Tadlock issued a warning citation to Charles for speeding, and he returned Charles's identification and paperwork to him. Charles had decided he wanted his mother to drive, so when he returned to the truck, he went to the passenger's side and Sandra got out. As Sandra was walking around the back of the truck, Tadlock yelled, "Hey, Sandra." She came to where he was standing, and he asked, "While I've got you here, do you mind if I ask you a few questions?" Sandra agreed, and Tadlock asked if she had any illegal weapons, drugs, or stolen property in the truck. She said she did not, and he asked if he could search the truck. Sandra said, "Yep." Tadlock and Sandra then got into the front seat of the patrol car so Tadlock could complete a written consent-to-search form for Sandra's signature. While Tadlock was completing the form and before Sandra signed it, Sandra stated she had changed her mind. She then asked why he needed to search her vehicle, and Tadlock responded that he believed she had illegal drugs in the vehicle and she was not being completely honest with him. He asked, "How much marijuana do you have in your car?" and Sandra responded, "I have no marijuana. Why do you think I do?" Tadlock also asked Sandra if she was responsible for everything in her vehicle, and Sandra answered, "Absolutely."

Tadlock advised Sandra that he was going to take his drug dog around the truck. Tadlock testified there are different ways his dog will respond to the presence of suspected controlled substances. The dog will "alert" by changing its behavior. It will "indicate" by scratching at a place or item. Tadlock took his K-9 around the truck several times. He testified the dog alerted by showing "a lot of interest but no indication." Tadlock put his dog back into the patrol car and called another officer with a K-9 unit to come to the scene. He also had another conversation with Task Force officers and learned they had additional information indicating there were drugs in the truck, and other officers were on their way to the scene to search the vehicle.

Tadlock told Sandra that his dog had shown interest in the back of the truck, and another drug dog was coming to the scene. He asked Sandra if he could look in the back of the truck, which was covered by a topper. According to Tadlock, Sandra consented without hesitation. The video shows that before Tadlock approached the back of the truck, Sandra stated, "Do you want him to go in [referring to the dog]? You can have him go in there. I don't want you to tear my car up." She stated she would rather have the dog go into the truck and tell Tadlock there were no drugs inside than to have Tadlock pull all of her stuff out. Tadlock and Sandra approached the truck and Sandra opened the back of the truck. Tadlock observed several items in the back of the truck. After some brief conversation about furniture and other items in the back of the truck, Tadlock got his dog from the patrol car, put it in the back of the pickup, and the dog indicated on something at the front of the truck bed, near the cab of the truck. Tadlock told Sandra and Charles that the dog's indication provided him with probable cause to search the truck. He pulled out a few items until he could reach the area where the dog had indicated, where he found marijuana inside a plastic bin. Tadlock placed Sandra and Charles under arrest.

> From the time Tadlock stopped the truck to the time he
> issued the warning ticket and gave Charles back his license and
> documents, about thirteen minutes had elapsed. From that
> time until the drugs were found, another twenty-four minutes
> had elapsed.

Report and Recommendation at pp. 1-5 (footnote omitted). Upon review of the record, the court adopts all of Judge Zoss's factual findings.

## II. LEGAL ANALYSIS

### A. Standard Of Review

The court reviews the magistrate judge's report and recommendation pursuant to the statutory standards found in 28 U.S.C. § 636(b)(1):

> A judge of the court shall make a de novo determination of
> those portions of the report or specified proposed findings or
> recommendations to which objection is made. A judge of the
> court may accept, reject, or modify, in whole or in part, the
> findings or recommendations made by the magistrate judge.
> The judge may also receive further evidence or recommit the
> matter to the magistrate judge with instructions.

28 U.S.C. § 636(b)(1) (2006); *see* Fed. R. Civ. P. 72(b) (stating identical requirements); N.D. IA. L.R. 72, 72.1 (allowing the referral of dispositive matters to a magistrate judge but not articulating any standards to review the magistrate judge's report and recommendation). While examining these statutory standards, the United States Supreme Court explained:

> Any party that desires plenary consideration by the Article III
> judge of any issue need only ask. Moreover, while the statute
> does not require the judge to review an issue *de novo* if no
> objections are filed, it does not preclude further review by the

> district judge, *sua sponte* or at the request of a party, under a
> *de novo* or any other standard.

*Thomas v. Arn*, 474 U.S. 140, 154 (1985). Thus, a district court *may* review de novo any issue in a magistrate judge's report and recommendation at any time. *Id.* If a party files an objection to the magistrate judge's report and recommendation, however, the district court *must* "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). In the absence of an objection, the district court is not required "to give any more consideration to the magistrate's report than the court considers appropriate." *Thomas*, 474 U.S. at 150.

De novo review, of course, is nondeferential and generally allows a reviewing court to make an "independent review" of the entire matter. *Salve Regina College v. Russell*, 499 U.S. 225, 238 (1991) (noting also that "[w]hen *de novo* review is compelled, no form of appellate deference is acceptable"); *see Doe v. Chao*, 540 U.S. 614, 620-19 (2004) (noting de novo review is "distinct from any form of deferential review"). The de novo review of a magistrate judge's report and recommendation, however, only means a district court "'give[s] fresh consideration to those issues to which specific objection has been made.'" *United States v. Raddatz*, 447 U.S. 667, 675 (1980) (quoting H.R. Rep. No. 94-1609, at 3, *reprinted in* 1976 U.S.C.C.A.N. 6162, 6163 (discussing how certain amendments affect 28 U.S.C. § 636(b))). Thus, while de novo review generally entails review of an entire matter, in the context of § 636 a district court's *required* de novo review is limited to "de novo determination[s]" of only "those portions" or "specified proposed findings" to which objections have been made. 28 U.S.C. § 636(b)(1); *see Thomas*, 474 U.S. at 154 ("Any party that desires plenary consideration by the Article III judge of any *issue* need only ask." (emphasis added)). Consequently, the Eighth Circuit

Court of Appeals has indicated de novo review would only be required if objections were "specific enough to trigger *de novo* review." *Branch v. Martin*, 886 F.2d 1043, 1046 (8th Cir. 1989). Despite this "specificity" requirement to trigger de novo review, the Eighth Circuit Court of Appeals has "emphasized the necessity . . . of retention by the district court of substantial control over the ultimate disposition of matters referred to a magistrate." *Belk v. Purkett*, 15 F.3d 803, 815 (8th Cir. 1994). As a result, the Eighth Circuit has been willing to "liberally construe[]" otherwise general pro se objections to require a de novo review of all "alleged errors," *see Hudson v. Gammon*, 46 F.3d 785, 786 (8th Cir. 1995), and to conclude that general objections require "full *de novo* review" if the record is concise, *Belk*, 15 F.3d at 815 ("Therefore, even had petitioner's objections lacked specificity, a *de novo* review would still have been appropriate given such a concise record."). Even if the reviewing court must construe objections liberally to require de novo review, it is clear to this court that there is a distinction between making an objection and making no objection at all. *See Coop. Fin. Assoc., Inc. v. Garst*, 917 F. Supp. 1356, 1373 (N.D. Iowa 1996) ("The court finds that the distinction between a flawed effort to bring objections to the district court's attention and no effort to make such objections is appropriate."). Therefore, this court will strive to provide de novo review of all issues that might be addressed by any objection, whether general or specific, but will not feel compelled to give de novo review to matters to which no objection at all has been made.

In the absence of any objection, the Eighth Circuit Court of Appeals has indicated a district court should review a magistrate judge's report and recommendation under a clearly erroneous standard of review. *See Grinder v. Gammon*, 73 F.3d 793, 795 (8th Cir. 1996) (noting when no objections are filed and the time for filing objections has expired, "[the district court judge] would only have to review the findings of the magistrate judge for clear error"); *Taylor v. Farrier*, 910 F.2d 518, 520 (8th Cir. 1990) (noting the

advisory committee's note to Fed. R. Civ. P. 72(b) indicates "when no timely objection is filed the court need only satisfy itself that there is no clear error on the face of the record"); *Branch*, 886 F.2d at 1046 (contrasting de novo review with "clearly erroneous standard" of review, and recognizing de novo review was required because objections were filed). The court is unaware of any case that has described the clearly erroneous standard of review in the context of a district court's review of a magistrate judge's report and recommendation to which no objection has been filed. In other contexts, however, the Supreme Court has stated the "foremost" principle under this standard of review "is that '[a] finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Anderson v. City of Bessemer City*, 470 U.S. 564, 573-74 (1985) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). Thus, the clearly erroneous standard of review is deferential, *see Dixon v. Crete Medical Clinic, P.C.*, 498 F.3D 837, 847 (8th Cir. 2007) (noting a finding is not clearly erroneous even if another view is supported by the evidence), but a district court may still reject the magistrate judge's report and recommendation when the district court is "left with a definite and firm conviction that a mistake has been committed," *U.S. Gypsum Co.*, 333 U.S. at 395.

Even though some "lesser review" than de novo is not "positively require[d]" by statute, *Thomas*, 474 U.S. at 150, Eighth Circuit precedent leads this court to believe that a clearly erroneous standard of review should generally be used as the baseline standard to review all findings in a magistrate judge's report and recommendation that are not objected to or when the parties fail to file any timely objections, *see Grinder*, 73 F.3d at 795; *Taylor*, 910 F.2d at 520; *Branch*, 886 F.2d at 1046; *see also* Fed. R. Civ. P. 72(b) advisory committee's note ("When no timely objection is filed, the court need only satisfy

itself that there is no clear error on the face of the record in order to accept the recommendation."). In the context of the review of a magistrate judge's report and recommendation, the court believes one further caveat is necessary: a district court always remains free to render its own decision under de novo review, regardless of whether it feels a mistake has been committed. *See Thomas*, 474 U.S. at 153-54. Thus, while a clearly erroneous standard of review is deferential and the minimum standard appropriate in this context, it is not mandatory, and the district court may choose to apply a less deferential standard.[1]

---

[1] The Eighth Circuit Court of Appeals, in the context of a dispositive matter originally referred to a magistrate judge, does not review a district court's decision in similar fashion. The Eighth Circuit Court of Appeals will either apply a clearly erroneous or plain error standard to review factual findings, depending on whether the appellant originally objected to the magistrate judge's report and recommendation. *See United States v. Brooks*, 285 F.3d 1102, 1105 (8th Cir. 2002) ("Ordinarily, we review a district court's factual findings for clear error . . . . Here, however, the record reflects that [the appellant] did not object to the magistrate's report and recommendation, and therefore we review the court's factual determinations for plain error." (citations omitted)); *United States v. Looking*, 156 F.3d 803, 809 (8th Cir. 1998) ("[W]here the defendant fails to file timely objections to the magistrate judge's report and recommendation, the factual conclusions underlying that defendant's appeal are reviewed for plain error."). The plain error standard of review is different than a clearly erroneous standard of review, *see United States v. Barth*, 424 F.3d 752, 764 (8th Cir. 2005) (explaining the four elements of plain error review), and ultimately the plain error standard appears to be discretionary, as the failure to file objections technically waives the appellant's right to appeal factual findings, *see Griffini v. Mitchell*, 31 F.3d 690, 692 (8th Cir. 1994) (stating an appellant who did not object to the magistrate judge's report and recommendation waives his or her right to appeal factual findings, but then choosing to "review[] the magistrate judge's findings of fact for plain error"). An appellant does not waive his or her right to appeal questions of law or mixed questions of law and fact by failing to object to the magistrate judge's report and recommendation. *United States v. Benshop*, 138 F.3d 1229, 1234 (8th Cir. 1998) ("The rule in this circuit is that a failure to object to a magistrate judge's report

(continued...)

As noted above, defendant Hanson has filed objections to Judge Zoss's Report and Recommendation. The court, therefore, undertakes the necessary review of Judge Zoss's recommended disposition of defendant Hanson's Motion to Suppress.

## B. Objections to Report and Recommendation

### 1. Staleness of information

Defendant Hanson's initial objection is to Judge Zoss's conclusion that Deputy Tadlock had reasonable suspicion to continue the stop after he had issued the warning ticket to Charles Hanson. Specifically, defendant Hanson argues that the information from the informant was too stale to be relied upon to support a finding of reasonable suspicion. The prosecution counters that the information known to law enforcement was not stale and more than sufficient to constitute reasonable suspicion to continue the stop.

While defendant Hanson contends that Deputy Tadlock unlawfully detained her when he asked her for permission to search her pickup truck after the traffic stop was over, "law enforcement officers do not violate the Fourth Amendment by asking a person for consent to search or other types of cooperation, even when they have no reason to suspect

---

[1](...continued)

and recommendation will *not* result in a waiver of the right to appeal '"when the questions involved are questions of law or mixed questions of law and fact."'" (quoting *Francis v. Bowen*, 804 F.2d 103, 104 (8th Cir. 1986), in turn quoting *Nash v. Black*, 781 F.2d 665, 667 (8th Cir. 1986))). In addition, legal conclusions will be reviewed de novo, regardless of whether an appellant objected to a magistrate judge's report and recommendation. *See, e.g.*, *United States v. Maxwell*, 498 F.3d 799, 801 n.2 (8th Cir. 2007) ("In cases like this one, 'where the defendant fails to file timely objections to the magistrate judge's report and recommendation, the factual conclusions underlying that defendant's appeal are reviewed for plain error.' We review the district court's legal conclusions de novo." (citation omitted)).

that person, 'provided they do not induce cooperation by coercive means.'" *United States v. Yang*, 345 F.3d 650, 654 (8th Cir. 2003) (quoting *United States v. Drayton,* 536 U.S. 194, 201 (2002)), *cert. denied*, 124 S. Ct. 1694 (2004); *see United States v. Rivera*, 570 F.3d 1009, 1014 (8th Cir. 2009); *United States v. Long*, 532 F.3d 791, 795 (8th Cir. 2008); *United States v. Luna*, 368 F.3d 876, 879 (8th Cir. 2004); *United States v. Jones*, 269 F.3d 919, 925 (8th Cir. 2001). As a result, "'the time it takes for an officer to find out if consent will be given cannot be an unlawful detention in the absence of coercive or otherwise unusual circumstances.'" *Luna*, 368 F.3d at 879 (quoting *Yang*, 345 F.3d at 654). Here, after completing the traffic stop, Deputy Tadlock asked for consent to search Hanson's pickup truck. Hanson immediately said, "Yep." Once Hanson gave her oral consent to search her pickup truck, it was reasonable for Deputy Tadlock to continue the encounter in reliance on Hanson's consent. *See Rivera*, 570 F.3d at 1013-14 ("When a motorist gives consent to search his vehicle, he necessarily consents to an extension of the traffic stop while the search is conducted, and Trooper Coleman reasonably could rely on Rivera's oral consent as a basis to extend the encounter.");*see also United States v. Esquivel,* 507 F.3d 1154, 1158 (8th Cir. 2007) (unnecessary to address contention of excessive length and scope of stop in light of defendant's consent to search). At this juncture, Deputy Tadlock and Hanson entered Tadlock's patrol car in order for Tadlock to prepare, and have Hanson sign, a written consent to search form. It was only after Tadlock had started preparing the written consent to search form that Hanson announced that she had "changed my mind" about consenting to the search. Immediately after Hanson revoked her oral consent to search, Deputy Tadlock walked his drug dog around Hanson's pickup truck. While Deputy Tadlock's drug dog gave an "alert" to Hanson's

pickup truck, it did not give an "indication" to it.[2]  The Eighth Circuit Court of Appeals has held that "a brief detention for a dog sniff at the end of a traffic stop is *de minimis* and does not violate the Fourth Amendment." *Rivera*, 570 F.3d at 1014; *see United States v. Alexander,* 448 F.3d 1014, 1016-17 (8th Cir. 2006); *United States v. Martin,* 411 F.3d 998, 1002 (8th Cir. 2005); *United States v. $404,905.00 in United States Currency,* 182 F.3d 643, 649 (8th Cir. 1999).

Because the purposes of Deputy Tadlock's initial traffic stop of Hanson's vehicle had been completed by this point, Deputy Tadlock could not subsequently detain Hanson unless he had reasonable suspicion for his renewed detention of Hanson.  "'Whether the particular facts known to the officer amount to an objective and particularized basis for a reasonable suspicion of criminal activity is determined in light of the totality of the circumstances.'" *United States v. Walker*, 555 F.3d 716, 769 (8th Cir. 2009) (quoting *United States v. Halls,* 40 F.3d 275, 276 (8th Cir. 1994) (quoting in turn *United States v. Garcia,* 23 F.3d 1331, 1334 (8th Cir. 1994); *see United States v. Hamilton*, 591 F.3d 1017, 1022 (8th Cir. 2010) ("Reasonable suspicion exists when, considering the totality of the circumstances known to the officer at the time, the officer has a particularized and objective basis for suspecting wrongdoing."); *United States v. Martinez-Cortes,* 566 F.3d

---

[2]Deputy Tadlock offered this explanation of the difference between a drug dog "alert" and an "indication" in his testimony at the evidentiary hearing:

> That's where the question is on a dog, a drug dog, there's an alert and the indication.  The alert is the change of behavior.  He'd alerted to the vehicle.  He didn't give the indication which he's an aggressive indicator where he would be scratching.

Suppression Hearing Tr. at 39.

767, 769 (8th Cir. 2009) ("In making reasonable-suspicion determinations, reviewing courts 'must look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing.'") (internal quotation marks omitted) (quoting *United States v. Arvizu,* 534 U.S. 266, 273 (2002)); *see also United States v. Pereira-Munoz,* 59 F.3d 788, 791 (8th Cir. 1995) (holding that reasonable suspicion is determined in the totality of the circumstances); *United States v. Bloomfield,* 40 F.3d 910, 918 (8th Cir. 1994) (holding that reasonable suspicion is determined in light of the totality of the circumstances).

The Eighth Circuit Court of Appeals has summarized the standards used to consider whether reasonable suspicion exists as follows:

> The standard of articulable justification required by the fourth amendment for an investigative, *Terry*-type seizure is whether the police officers were aware of "particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant[ed] suspicion that a crime [was] being committed." *United States v. Martin,* 706 F.2d 263, 265 (8th Cir. 1983); *see also Terry,* 392 U.S. at 20-21, 88 S. Ct. at 1879-80. In assessing whether the requisite degree of suspicion exists, we must determine whether the facts collectively establish reasonable suspicion, not whether each particular fact establishes reasonable suspicion. "[T]he totality of the circumstances-the whole picture-must be taken into account." *United States v. Cortez,* 449 U.S. 411, 417, 101 S. Ct. 690, 695, 66 L. Ed. 2d 621 (1981). We may consider any added meaning certain conduct might suggest to experienced officers trained in the arts of observation and crime detection and acquainted with operating modes of criminals. *See United States v. Wallraff,* 705 F.2d 980, 988 (8th Cir. 1983). It is not necessary that the behavior on which reasonable suspicion is grounded be susceptible only to an interpretation of guilt, *id.*; however, the officers must be acting on facts directly relating to the suspect or the suspect's conduct and not just on a

> "hunch" or on circumstances which "describe a very broad
> category of predominantly innocent travelers." *Reid v.
> Georgia,* 448 U.S. [438] at 440-41, 100 S. Ct. [2752] at 2754
> [65 L. Ed. 2d 890]; *United States v. Sokolow,* 831 F.2d 1413
> (9th Cir. 1987), [rev'd on other grounds, 490 U.S. 1, 109 S.
> Ct. 1581, 104 L. Ed. 2d 1 (1989) ].

*United States v. Beck*, 140 F.3d 1129, 1136-37 (8th Cir. 1998) (internal quotation marks

omitted) (quoting *United States v. Campbell*, 843 F.2d 1089, 1093 (8th Cir. 1988)).

As discussed above, defendant Hanson objects to Judge Zoss's Report and

Recommendation on the ground that the information from the informant was too stale to

be relied upon to support a finding of reasonable suspicion. "There is no bright-line test

for determining when information is stale." *United States v. Stachowiak*, 521 F3d 852,

856 (8th Cir. 2008); *see United States v. Perry*, 531 F.3d 662, 666 (8th Cir. 2008); *United

States v. Summage,* 481 F.3d 1075, 1078 (8th Cir. 2007), *cert. denied,* 128 S. Ct. 875

(2008); *United States v. Gettel*, 474 F.3d 1081, 1086 (8th Cir. 2007); *United States v.

Koelling,* 992 F.2d 817, 822 (8th Cir. 1993). Rather, "'[t]ime factors must be examined

in the context of a specific case and the nature of the crime under investigation.'" *United

States v. Morrison*, 594 F.3d 626, 631 (8th Cir. 2010) (quoting *United States v. Caswell*,

436 F.3d 894, 898 (8th Cir. 2006)); *accord Perry*, 531 F.3d at 666; *Stachowiak*, 521 F3d

at 856; *Gettel*, 474 F.3d at 1086; *Koelling,* 992 F.2d at 822. As the Eighth Circuit Court

of Appeals recently observed:

> "'[W]here continuing criminal activity is suspected, the
> passage of time is less significant.'" *Jeanetta,* 533 F.3d at 655
> (quoting *United States v. Formaro,* 152 F.3d 768, 771 (8th
> Cir. 1998)). "In investigations of ongoing narcotics operations,
> intervals of weeks or months between the last described act
> and the application for a warrant does not necessarily make the
> information stale." *Id.* (internal quotations, alterations, and
> citations omitted); *see also United States v. Pitts,* 6 F.3d 1366,

> 1369 (9th Cir. 1993) (finding that "'[w]ith respect to drug
> trafficking, probable cause may continue for several weeks, if
> not months, of the last reported instance of suspect activity.'")
> (quoting *United States v. Angulo-Lopez,* 791 F.2d 1394, 1399
> (9th Cir. 1986)).

*Morrison*, 594 F.3d at 631.

Here, while the confidential source contacted the Sioux City Police in May of 2009, the information he provided was of an ongoing marijuana distribution ring. Moreover, law enforcement personnel twice corroborated information received from the confidential source, including the day of the traffic stop at issue here. Because of the nature and circumstances of this case, and the fact that law enforcement officers had received recent corroboration of information previously received from the confidential source, the court finds that the information supporting reasonable suspicion was not stale. Accordingly, defendant Hanson's first objection is overruled.

### 2.    *Lack of veracity of the confidential informant*

Defendant Hanson's next objection is that, due to the absence of information regarding the veracity of the confidential informant, the informant's information cannot be considered sufficiently reliable to support a finding of reasonable suspicion. Here, the police received information from a known but unproven confidential informant regarding defendant Hanson's drug operation. The Eighth Circuit Court of Appeals has observed that:

> Unproven informants are individuals without a track record of
> supplying information to law enforcement officers. "Though
> less reliable than informants with a proven record, unproven
> informants are more reliable than anonymous tipsters because
> the police can hold them responsible for false information."
> *Kent,* 531 F.3d at 649. Nevertheless, information supplied by
> such individuals "requires some independent verification to

> establish reliability." *Id.* (citing *United States v. Brown,* 49
> F.3d 1346, 1349 (8th Cir. 1995)). "Independent verification
> occurs when the information (or aspects of it) is corroborated
> by the independent observations of police officers." *Brown,* 49
> F.3d at 1349.

*United States v. Nolen*, 536 F.3d 834, 840 (8th Cir. 2008). The Eighth Circuit Court of

Appeals has recognized that "independent corroboration of even innocuous facts makes it

more likely an informant is telling the truth about incriminating ones, and corroboration

of innocent behavior can provide the basis for establishing probable cause." *United States

v. Ketzeback,* 358 F.3d 987, 991, 992 (8th Cir. 2004). The thinking here is that "an

informant who is correct about some things more likely will be correct about critical

unverified facts. . ." *United States v. Reivich*, 793 F.2d 957, 960 (8th Cir. 1996). In this

case, there was some independent verification; law enforcement officers confirmed the

confidential informant's information about the make, model and color of vehicles defendant

Hanson was using to transport marijuana from Texas to Iowa, as well as documenting two

trips to Texas by one of these vehicles. Moreover, an additional indicia of reliability here

is that the confidential informant made a statement against penal interest by admitting his

past drug dealings with defendant Hanson. *See United States v. Harris,* 403 U.S. 573,

583-84 (1971). As the Eighth Circuit Court of Appeals has recognized, "'one who knows

the police are already in a position to charge him with a serious crime will not likely

undertake to divert the police down blind alleys.'" *Reivich*, 793 F.2d at 960 (quoting

*United States v. Davis,* 617 F.2d 677, 693 (D.C. Cir. 1979) (quoting in turn 1 W. LaFave,

*Search and Seizure,* § 3.3, at 528 (1978), *cert. denied,* 445 U.S. 967 (1980)).

Therefore, this objection is also overruled.

### 3.     *Lack of drug dog's initial indication*

Defendant Hanson further objects on the ground that the lack of an initial "indication" by Deputy Tadlock's drug dog should have negated any reasonable suspicion to detain defendant Hanson's vehicle.   Defendant Hanson, however, has not directed the court to any controlling authority supporting her argument.   More importantly, the Eighth Circuit Court of Appeals has held that a negative dog alert alone does not eliminate the existence of reasonable suspicion:

> The Tenth Circuit has held a dog's failure to alert on a package removed from the mail stream does not require an investigator to return the package to the mail stream immediately. *United States v. Ramirez,* 342 F.3d 1210, 1212-13 (10th Cir. 2003). Similarly, the district court stated that
>
>> while a positive alert to a package, by a police canine, may alone be sufficient to establish probable cause to search the package, see, *United States v. Sun[d]by,* 186 F.3d 873, 876 (8th Cir. 1999), the Defendant cites to no authority, nor did our independent inquiry reveal any, for the opposite proposition-namely, that a negative alert dissipates any reasonable suspicion where, as here, several articulable factors supported Nichols['s] assessment that a reasonable suspicion existed to subject the package to a dog sniff in her presence.
>
> We agree.

*United States v. Lakoskey*, 462 F.3d 965, 976-77 (8th Cir. 2006); *see United States v. Ramirez*, 342 F.3d 1210, 1213 (10th Cir. 2003) ( "We will not require investigators to cease an otherwise reasonable investigation solely because a dog fails to alert, particularly when we have refused to require that a dog sniff test be conducted at all."); *United States v. Jodoin*, 672 F.2d 232, 236 (1st Cir. 1982) (Breyer, J.) (holding that a "dog's failure to

react does not . . . destroy the 'probable cause' that would otherwise exist. It is just another element to be considered."); *United States v. Sullivan*, 625 F.2d 9, 12 (4th Cir. 1980) (upholding detention when a "dog did not show a 'full alert'" but "did show an interest in one blue bag"). Here, when one considers the fact that Deputy Tadlock's drug dog alerted to defendant Hanson's pickup truck, but did not indicate, and the fact that drug couriers often mask the scent of drugs so that a drug sniffing dog will not indicate, *see United States v. 141,770.00 in United States Currency*, 157 F.3d 600, 604 n. 4 (8th Cir. 1998) ("The wide-spread use of scented dryer sheets to mask the smell of illegal narcotics is well documented in the decisions of the Courts of Appeals."), the drug dog's initial failure to indicate on defendant Hanson's pickup truck did not negate the other facts and information supporting the existence of reasonable suspicion. Therefore, this objection is also overruled.

### 4. *Voluntariness of consent to search*

Defendant Hanson also objects to Judge Zoss's finding that she voluntarily consented to the search of her pickup truck. "Whether an individual's consent is voluntary is a question of fact that must be determined from the totality of the circumstances." *United States v. Arciniega*, 569 F.3d 394, 398 (8th Cir. 2009) (citing *United States v. Smith,* 260 F.3d 922, 924 (8th Cir. 2001) (quoting in turn *Schneckloth v. Bustamonte,* 412 U.S. 218, 227 (1973)); *accord United States v. Kelley*, 594 F.3d 1010, 1013 (8th Cir. 2010); *United States v. Esquivel*, 507 F.3d 1154, 1159 (8th Cir. 2007); *United States v. Perry*, 437 F.3d 782, 785 (8th Cir. 2006); *United States v. Gipp*, 147 F.3d 680, 685 (8th Cir. 1998). Some of the circumstances to be considered were outlined by the Eighth Circuit Court of Appeals in *Arciniega*:

> Factors relevant to the analysis include (1) the individual's age
> and mental ability; (2) whether the individual was intoxicated

or under the influence of drugs; (3) whether the individual was
informed of his *Miranda* rights; and (4) whether the individual
was aware, through prior experience, of the protections that
the legal system provides for suspected criminals. *Id.* (citing
*United States v. Chaidez,* 906 F.2d 377, 381 (8th Cir. 1990)).
It is also important to consider the environment in which an
individual's consent is obtained, including (1) the length of the
detention; (2) whether the police used threats, physical
intimidation, or punishment to extract consent; (3) whether the
police made promises or misrepresentations; (4) whether the
individual was in custody or under arrest when consent was
given; (5) whether the consent was given in public or in a
secluded location; and (6) whether the individual stood by
silently or objected to the search. *Id.*

*Arciniega*, 569 F.3d at 398; *accord United States v. Barnum*, 564 F.3d 964, 969 (8th Cir.

2009); *United States v. Esquivias*, 416 F.3d 696, 700 (8th Cir. 2005); *Perry*, 437 F.3d at

785.

Here, the court finds that under the totality of the circumstances, defendant Hanson

voluntarily consented to the search of her pickup truck. Defendant Hanson is an adult,

owns her own business and generally appeared to be of normal intelligence. There is no

evidence that she had any difficulty understanding English and there is no indication that

she was under the influence of drugs or alcohol at the time Deputy Tadlock requested

permission to search her vehicle. Moreover, there is no evidence that she did not

understand what was going on. The conversation between defendant Hanson and Deputy

Tadlock was conducted in a cordial manner and in normal conversational tones, and

Hanson's responses to Tadlock's statements were appropriate. Deputy Tadlock had no

physical contact with defendant Hanson, did not draw or otherwise display his sidearm or

any other weapon, or make any other show of force. While Deputy Tadlock did not

inform Hanson of her right to refuse consent, defendant Hanson's previous revocation of

her initial consent to a search of her vehicle demonstrates a general understanding of her right to refuse to consent. Deputy Tadlock made no misrepresentations to her. In addition, defendant Hanson was only detained a short time before she consented to the search of her vehicle, was not threatened or intimidated by Deputy Tadlock, did not consent as a result of any promises from Deputy Tadlock, and the consent to search occurred on a public highway with her son present. Under the totality of these circumstances, the court finds that Judge Zoss correctly found that defendant Hanson's consent to a search of her vehicle was voluntary. Therefore, this objection is also overruled.

## III. CONCLUSION

Therefore, for the reasons set out above, the court, upon a *de novo* review of the record, accepts Judge Zoss's Report and Recommendation and **denies** defendant Hanson's Motion To Suppress.

**IT IS SO ORDERED.**

**DATED** this 19th day of March, 2010.

_____
MARK W. BENNETT
U. S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA